**COURT OF APPEALS
DECISION
DATED AND FILED**

**September 21, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP967**

Cir. Ct. No.  **2019ME259**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

---

IN THE MATTER OF THE MENTAL COMMITMENT OF D. G. M.:

OUTAGAMIE COUNTY,

    PETITIONER-RESPONDENT,

  V.

D. G. M.,

    RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Outagamie County: VINCENT R. BISKUPIC, Judge. *Affirmed*.

¶1      HRUZ, J.[1]  Daniel[2] appeals from an order for commitment and an order for involuntary medication and treatment, both entered pursuant to WIS.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

STAT. ch. 51. Daniel challenges the sufficiency of the evidence establishing that he was mentally ill, a proper subject for treatment, dangerous, and incompetent to refuse medication. We affirm.

## BACKGROUND

¶2 On successive evenings in July 2019, Daniel had two several-hour phone conversations with his pastor and friend, Adin Crandall. Daniel made several statements that prompted Crandall to call the police on the night of the second call out of a concern that Daniel might be a threat to either himself or to his next-door neighbor.[3] After law enforcement took Daniel into custody, his blood alcohol content was determined to be .24, indicating that Daniel was intoxicated at the time of the call. Daniel later confirmed that he had been drinking the night police took him into custody. The officers took Daniel to St. Elizabeth's Hospital, where he was placed on an emergency detention pursuant to WIS. STAT. § 51.15(1).

¶3 After a hearing, the circuit court found probable cause to believe that Daniel was mentally ill, a proper subject for treatment, and dangerous to himself

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

[3] Throughout the record and both parties' briefs, the person Daniel threatened during his call with Crandall is universally referred to as Daniel's "neighbor." Daniel clarified at the final hearing that the people living next door to him are tenants and the person with whom he was frustrated was actually his neighbor's landlord. Any ambiguity in this regard is not material to our analysis, as it is clear Daniel was threatening someone with an interest in the neighboring property whom he had met before. Throughout the remainder of this opinion, we refer to the subject of Daniel's ire as his "neighbor" to avoid possible confusion resulting from conflicting terms.

or others. The court entered an order detaining Daniel at the hospital until the final hearing, pursuant to WIS. STAT. § 51.20(8)(b).

¶4      A final commitment hearing was held on August 12, 2019, at which Crandall testified as to the substance of the two phone calls he had with Daniel. He recounted that they discussed a variety of topics during these conversations, including Daniel's abusive childhood, the death of Daniel's mother, and Daniel's experience in the Gulf War, including the people he had killed there. Daniel also explained to Crandall the many ways in which he was well trained to kill a person, both from a distance by using a rifle and in close quarters with his fists or a pen.

¶5      Crandall was specifically worried about Daniel's reaction to his neighbor, who had placed debris from a fallen tree on Daniel's property. Daniel later testified that when he was talking to Crandall on the phone, "I told him that when I had to move it, with the way my back is, it tore me up and it took me a very long time to move it." Crandall further testified that Daniel never explicitly threatened his neighbor. During the conversation about the debris, however, Daniel angrily mentioned the .22 caliber pellet rifle that he owned and stated that the .22 pellet could "go through a skull just as easy as a half inch piece of plywood." Crandall concluded: "I took it to mean that he was—he was threatening his neighbor and that was my impression. Although he didn't come out and say it exactly that way."

¶6      Crandall also testified that he was concerned about several other statements that Daniel made during the relevant phone calls. In particular, he relayed that Daniel "talked about how he had put the gun to his head on more than one occasion. And had put pressure [on], but had not pulled the trigger." Although Crandall did not remember if Daniel had put a time frame on when he

had placed a gun to his head, Crandall agreed that Daniel had been specific that he had done so on more than one occasion. Crandall noted that Daniel had, since his detention, clarified to him the comments Daniel had made. Specifically, Daniel explained that the conversation about putting a gun to his own head was from a previous conversation he had with his brother, and that he had been merely retelling that incident to Crandall.

¶7 Crandall further testified that he had trouble hearing Daniel during parts of the two phone calls preceding Daniel's commitment, and that Daniel had been "fading out on me several times" during the calls. Specifically, this issue occurred during their discussion about Daniel touching the gun's trigger, and Crandall noted he did not hear the entire conversation in that regard. When asked, "[I]n hindsight, do you feel that he was actually a threat to anyone?" Crandall replied, "I think probably not. Again, it was his clarification of the conversation. And the conversation, as I said before, was broken up by his voice fading out on me several times." Crandall clarified, however, that "[a]t the time, I did feel he was a threat."

¶8 Daniel testified at the final hearing. He also clarified that his discussion with Crandall about putting a gun to his own head had been his retelling of a prior conversation he had with his brother on why having a long trigger pull on a weapon might be beneficial. Daniel further testified that he had told his brother "that if a person had a gun, or if I had it to my head, I would be pulling and pulling and pulling, and it would give me a long time to make a different decision and put it down." Despite the nature of his discussion with Crandall, Daniel testified that "the whole conversation had nothing to do with suicide" and "it was never a comment about actual suicide in itself."

¶9 Daniel further testified that although he had been frustrated with the neighbor as a result of him putting debris on Daniel's property, he had only said, "I was so mad I could shoot him." He explained that this statement was a figure of speech he had learned from his mother, and that it was not meant to be taken literally as an expression of criminal intent or harm—rather, it was a manner of expressing anger. When asked about a picture of an assault rifle that Daniel had sent Crandall after one of the two relevant calls, Daniel explained that it was related to their mutual interest in guns, as Crandall was a gun enthusiast.

¶10 Psychologist L. William Topel testified as to his examination of Daniel, stating that he concluded Daniel suffered from a "depressive disorder not otherwise specified," and that he exhibited signs of "extended grief and loss," as well as "an inability to really function well in his life going forward." Topel stated that although Daniel did not appear suicidal during the evaluation, Daniel mentioned having had suicidal thoughts and his belief that everyone has those thoughts.

¶11 Topel concluded that Daniel was dangerous in that he had "impaired judgment" and "may not be able to control [his] acts or intent." Topel opined that, paired with his alcohol use and his thoughts of harming other people, Daniel's knowledge of weaponry "could be used impulsively if his judgment were not clear in a particular moment," and that "especially under periods of intoxication, [Daniel] may not be able to exercise reasonable judgment." Topel also stated that with respect to Daniel's thoughts about harming others, "my impression is that those thoughts continued even when he was sober." Topel further determined that Daniel did not believe he had a mental illness or needed treatment, and he recommended an involuntary medication and treatment order based on the risk of Daniel stopping medication as a result of that belief.

5

¶12    Psychiatrist Marshall Bales also testified as to his examination of Daniel.    Bales stated that Daniel had "some depression, but was not too depressed," and that he was loud and irritable, exhibiting an unclear thinking process.  Bales diagnosed Daniel with a "mood disorder, not otherwise specified," which he characterized as a "substantial disorder of thought, mood, or perception." He recounted that Daniel had admitted to him that he had been upset and depressed around the time he had been detained, and that he had been considering giving up on life.  Bales further testified that Daniel was abusing pills and alcohol, despite Daniel downplaying his addiction problems.    Bales testified that he considered Daniel to be dangerous because he

> was not really level with me.  And yet he clearly had been dangerous leading up to his admission and when detained. He tried to downplay it with me.  When I met with him, he was all about just wanting to get out and frankly go back to his old ways.  And I just think he has both an unstable mood complicated by addiction problems.

Bales noted that during their examination, "[Daniel] was really not giving the severity of his threats like he did to that pastor," and he was downplaying the severity of the incidents after the fact.

¶13    Bales emphasized the importance of an involuntary medication and treatment order to help Daniel get his addiction under control and to ensure he did not "doctor shop" for addictive pills, as Daniel was taking a large number of medications.  Bales found Daniel to be dangerous, referencing the incident in which Daniel placed a gun to his head.  In support of his conclusion that Daniel was dangerous, Bales emphasized his own discussion with Crandall, who had found the call with Daniel to be "extremely alarming" after "hours of [Daniel] talking about weapons and pellets going through plywood so they could easily go through a skull."

¶14    The circuit court concluded that Daniel had a mental illness, relying on the entire court record and, in particular, on the testimony and reports of the doctors.  The court also concluded that Daniel was dangerous, based on Bales' testimony that Daniel had acknowledged placing a gun to his head on one or more occasions during the previous six- or seven-month period.  Furthermore, the court stated it was making credibility assessments based on the discrepancies in the testimony, and that the incidents that had occurred—including Daniel placing a gun to his head on one or more occasions and Daniel's dispute with his neighbor as discussed in the phone calls—contributed to its dangerousness finding.  The court mentioned that by drinking until he reached a .24 blood-alcohol level while also taking "seven or eight or nine medications that are very serious," Daniel further demonstrated that he posed a danger to himself, as the combination of alcohol and medications "could potentially be lethal on its own regardless of any other comments."  On August 12, 2019, the court entered an order for involuntary commitment, accompanied by an order for involuntary medication and treatment, both to remain in effect for a period of six months.  Daniel now appeals.

## DISCUSSION

¶15    Daniel's involuntary commitment order and the associated order for involuntary medication and treatment have expired.  Nevertheless, the parties agree that Daniel's appeal of the involuntary commitment order is not moot because the continuing firearm ban imposed by that order serves as an ongoing collateral consequence.  *See* ***Marathon Cnty. v. D.K.***, 2020 WI 8, ¶25, 390 Wis. 2d 50, 937 N.W.2d 901.  Daniel, however, also asserts that the expired involuntary medication and treatment order is not moot, while Outagamie County claims that it is moot because Daniel can show no collateral consequence stemming from the involuntary medication and treatment order.

7

¶16     We generally do not consider moot issues. *State ex rel. Olson v. Litscher*, 2000 WI App 61, ¶3, 233 Wis. 2d 685, 608 N.W.2d 425. "An issue is moot when its resolution will have no practical effect on the underlying controversy." *Id.*   Because Daniel is no longer subject to the involuntary medication and treatment order, a decision on that order's validity will have no practical effect. *See Portage Cnty. v. J.W.K.*, 2019 WI 54, ¶14, 386 Wis. 2d 672, 927 N.W.2d 509.

¶17     Daniel asserts several undeveloped arguments to the contrary, ultimately citing *D.K.* for the proposition that "collateral consequences can render an otherwise moot issue not moot." *See D.K.*, 390 Wis. 2d 50, ¶23.   Daniel is unclear, however, as to what current collateral consequences stem from his involuntary medication and treatment order.   In addition, Daniel argues that he cannot prove any collateral consequences exist because he is barred from citing to evidence outside of the appellate record.   Although Daniel may feel he cannot prove certain points without introducing evidence outside of the record, none of the arguments he presents are persuasive, regardless of whether they could be supported by extrinsic evidence.   None of the general mootness exceptions outlined in *D.K.* apply here with respect to the involuntary medication and treatment order.   The issue is therefore moot, and we decline to address it.[4]

¶18     In a WIS. STAT. ch. 51 proceeding, a petitioner has the burden to prove by clear and convincing evidence that a subject individual is mentally ill, a

---

[4] We do note, however, that if we were to find Daniel's underlying commitment order invalid, that reversal would also result in the reversal of the corresponding order for involuntary medication and treatment, as the involuntary medication and treatment order is tied to the existence of a lawful commitment. *See* WIS. STAT. § 51.61(1)(g)3.

proper subject for treatment, and dangerous. *See* WIS. STAT. § 51.20(1)(a), (13)(e). Whether this burden has been met presents a mixed question of fact and law. *Waukesha Cnty. v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* Whether these findings satisfy the statutory standards is a question of law that we review de novo.[5] *Id.*

¶19 As an initial matter, we address Daniel's argument that the two doctors' reports provided pursuant to WIS. STAT. § 51.20(9)(a)5. were not admitted into evidence at the final hearing and cannot be considered. This issue seems most relevant to the propriety of the involuntary medication order, which we have concluded is a moot issue. Regardless, Daniel's factual premise is invalid. The final hearing transcript is clear that the circuit court admitted the expert reports into evidence. The court explicitly stated to Bales: "I have your report and Dr. Topel's report and I received those into the record." Daniel did not raise any objection at the hearing to the reports being entered into evidence in this manner. Accordingly, Daniel's argument fails.

---

[5] The circuit court issued a final decision in this case in August 2019. Our supreme court has since implemented a requirement in *Langlade County v. D.J.W.*, 2020 WI 41, ¶3, 391 Wis. 2d 231, 942 N.W.2d 277, that "going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based." While *D.J.W.* addressed a recommitment petition and not, as here, an initial commitment, we assume the court's ruling regarding the specific reference to a statutory dangerousness standard equally applies to initial commitments. *See Winnebago Cnty. v. A.A.L.*, No. 2020AP1511, unpublished slip op. ¶17 n.8 (WI App Mar. 24, 2021) (citing *D.J.W.*, 391 Wis. 2d 231, ¶¶42-44).

Because the circuit court was not yet subject to this requirement when it made its factual findings, we will search the record and the court's decision for specific facts that apply to the dangerousness determination at issue. *See Winnebago Cnty. v. S.H.*, 2020 WI App 46, ¶¶14-15, 393 Wis. 2d 511, 947 N.W.2d 761.

¶20    Turning to the merits, Daniel first argues that the County failed to prove by clear and convincing evidence that he is mentally ill because neither diagnosis by the evaluating physicians met the statutory definition of mental illness.  In an involuntary commitment, "mental illness" is defined in WIS. STAT. § 51.01(13)(b) as "a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life, but does not include alcoholism."  Daniel contends that Topel merely diagnosed him with a "depressive order not otherwise specified" based in large part on Daniel appearing overly sad when speaking about his mother's death less than a year after she had passed away.  Furthermore, while Topel also said Daniel had difficulty "getting going in activities of daily living," Daniel argues that neither of these assessments rises to the level of a "substantial disorder of thought, mood, perception, orientation, or memory" that would necessitate commitment.  Instead, he contends these are typical expressions of loss.

¶21    We acknowledge that the testimony at the hearing did not include a lengthy discussion on how Daniel's mental illness fit within the statutory definition under WIS. STAT. § 51.01(13)(b).  However, medical experts are not required to use particular statutory words in expressing their opinions.  *See D.K.*, 390 Wis. 2d 50, ¶54.  It is the circuit court's obligation, not the experts', to determine whether testimony and other evidence presented at a final hearing support a relevant statutory finding.  *See* WIS. STAT. §§ 51.20(10)(c), 51.20(13).  Whether evidence presented at a hearing is sufficient to meet the requirements of a WIS. STAT. ch. 51 commitment is ultimately a question of law.  *See Langlade County v. D.J.W.*, 2020 WI 41, ¶25, 391 Wis. 2d 231, 942 N.W.2d 277.  Here, the content of the doctors' reports, in addition to their testimony at the hearing, were

sufficient to establish that Daniel was mentally ill, even if the exact language used at the final hearing did not mirror the definition in § 51.01(13)(b).

¶22    The findings of both doctors, combined, support the conclusion that Daniel suffered from a substantial disorder of thought, mood, perception or memory, specifically one that "grossly impair[ed]" his judgment. *See* WIS. STAT. § 51.01(13)(b). Topel confirmed at the final hearing that he believed Daniel to be suffering from a depressive disorder, supported by the signs of severe grief and melancholia that he had perceived, in addition to Daniel's admission that he was suffering from depression and melancholia. Topel concluded that as a result of these disorders, Daniel suffered from "impaired judgment," especially during periods of intoxication, but also while he was sober. In addition Topel determined that "[Daniel's] insight and judgment appear to be limited due to his focus on wrongs committed by others toward him." Topel testified that Daniel's impaired judgment and resulting thoughts of harm were evidenced by the incident that led to his detention, as well as by his implied threats of harm to his neighbor.

¶23    Bales' testimony further supports the conclusion that Daniel was mentally ill at the time he was committed. In particular, Bales diagnosed Daniel with a "mood disorder" that was a "substantial disorder of thought, mood, or perception." Bales concluded that Daniel had been depressed and suicidal around the time he had been detained, and that during Bales' evaluation Daniel had been downplaying "everything," including the events leading up to Daniel being detained. Bales further stated in his report that Daniel's insight and judgment were "quite grossly impaired," that Daniel's threats toward himself and others were related to his mood disorder, and that Daniel's dangerousness was complicated by his abuse of alcohol and pills.

¶24 Daniel argues that Bales' findings are merely conclusory. But it is evident they are based on his evaluation of Daniel in addition to his review of records detailing relevant incidents, and they are not just a recitation of statutory language. Indeed, Daniel's initiation of hours of conversation fixating on the people he had killed and the many ways he could kill a person—which is evident from Bales' interview of Crandall and Crandall's testimony at the hearing—supports a finding that Daniel suffered from grossly impaired judgment as a result of his disorder. The circuit court's conclusion that Daniel was mentally ill was based on the reports and testimony of both doctors. Considering the entirety of the record, we conclude that sufficient evidence was presented to support the court's conclusion that Daniel was both mentally ill under WIS. STAT. § 51.01(13)(b) and a proper subject for treatment.[6]

¶25 Daniel further argues that the circuit court placed improper emphasis on his alcohol use in reaching its conclusions that he was mentally ill and dangerous. WISCONSIN STAT. § 51.01(13)(b) defines mental illness as being a substantial disorder of a number of possible varieties, but it "does not include alcoholism." However, neither the doctors' conclusions nor the court's final decision were based on alcohol dependency. Instead, Daniel's alcohol consumption became relevant when considered in conjunction with his mood disorder and the variety of psychotropic medications that he was taking, a regimen

---

[6] Daniel's only argument that the circuit court erred by concluding he was a "proper subject for treatment" is that such exact language was not used at the hearing, nor was evidence presented on that point. This argument has no merit, and it is contingent on Daniel's incorrect argument about the court's reliance on the experts' written reports. Bales concluded in his report that Daniel's condition was treatable and that he was a proper subject for treatment. Topel opined that treatment was necessary to help Daniel with his illness, and he checked the box in his report indicating that Daniel was a proper subject for treatment. As we have already explained, the court properly considered both doctors' reports.

the court noted could "potentially be lethal" when combined with alcohol. Describing the effects that alcohol consumption has on an existing mental disorder is not the same as basing a diagnosis of mental illness on alcoholism, and both doctors described Daniel's alcohol use separately from their diagnoses of Daniel's underlying mental illness. The discussion of alcohol use, therefore, was not improper.

¶26 Daniel next argues that the County failed to introduce sufficient evidence to establish his dangerousness under WIS. STAT. § 51.20. In particular, he contends the evidence establishes "nothing more than intoxicat[ed] ramblings during a telephone conversation with a friend, with no threatened or actual harm to anyone." We disagree, as this assessment severely discounts the record, the circuit court's credibility findings, and the two experts' opinions.

¶27 A petitioner may prove that a person is dangerous and warrants commitment under any of the five standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. *See D.J.W.*, 391 Wis. 2d 231, ¶30. Daniel first contends that the County failed to establish dangerousness under § 51.20(1)(a)2.c., which provides that an individual is dangerous if he or she: "Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." The final hearing transcript and reports from both testifying doctors support the circuit court's conclusion that Daniel was dangerous in this regard. Bales testified that Daniel admitted he had been depressed and considering giving up on life, and that he had placed a gun to his head. The court relied on these and other facts in finding that Daniel was dangerous to himself or others.

13

¶28 In Bales' report, he further concluded, based on his conversation with Crandall, that Daniel had "clearly told the pastor about the thoughts of killing himself or [his] neighbor repeatedly." Crandall confirmed at the final hearing that Daniel had admitted to putting a gun to his head on more than one occasion. These events showcase Daniel's impaired judgment, a significant effect of his mental illness as we previously described above. In addition, Bales opined that Daniel's "alcohol abuse and the abuse of various pills" further complicate his mood disorder and contribute to his dangerousness.

¶29 Topel's examination and testimony further support a conclusion that Daniel was dangerous under WIS. STAT. § 51.20(1)(a)2.c. In his report, Topel concluded that Daniel's reported behaviors paired with his significant depressive symptoms, fixations, and threats of harm to others suggested a significant probability of harm without mental health treatment. Topel concluded that Daniel was dangerous under § 51.20(1)(a)2.c., that Daniel had "impaired judgment" and "may not be able to control [his] acts or intents," and that Daniel's threatening thoughts continued even when he was sober. Topel further confirmed that Daniel had thoughts of suicide. Additionally, the circuit court made credibility assessments about Daniel's testimony in concluding that he was dangerous, noting that it was not able to take his diverging testimony at face value. In sum, the evidence—as outlined more fully in the earlier portions of this opinion—sufficiently supports the conclusion that Daniel is dangerous, and that his impaired judgment manifests a substantial probability of harm to himself or others.

14

¶30 Daniel's recent threatening behavior toward his neighbor also meets the dangerousness standard under WIS. STAT. § 51.20(1)(a)2.b.[7] Although Daniel argues that his neighbor was unaware of the threats that were made and therefore could not have been placed in "reasonable fear" of violent behavior or harm, § 51.20(1)(a)2.b. does not require that the subject of a specific threat be the person placed in a reasonable fear of violent behavior. *See D.K.*, 390 Wis. 2d 50, ¶38 ("evidence that a person was placed in reasonable fear of serious physical harm to that person *or another person* can be sufficient to establish a 'reasonable fear' under § 51.20(1)(a)2.b.") (emphasis added)).

¶31 Daniel made a number of comments about killing, his ability to kill, and the people he had killed. Accompanied by anger toward his neighbor, Daniel also made contemporaneous comments about piercing a skull with pellets— comments that Crandall perceived to be a threat toward Daniel's neighbor. Together, these comments establish dangerousness under WIS. STAT. § 51.20(1)(a)2.b. because Crandall was placed in reasonable fear that Daniel would commit a violent act against another person. This fear was reasonable given the overall context of the phone conversations, and it firmly established a substantial probability of harm to others.

---

[7] The relevant portion of WIS. STAT. § 51.20(1)(a)2.b. states that an individual is dangerous if he or she:

> Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

¶32 We have already established that the evidence was sufficient to find Daniel dangerous under several of the standards in WIS. STAT. § 51.20(1)(a)2. We nonetheless note that there would also likely be valid grounds for his commitment under § 51.20(1)(a)2.a. given the testimony and doctors' reports evidencing that Daniel had been contemplating suicide and had placed a gun to his head several times, possibly during the course of one of the relevant phone calls. We do not address Daniel's arguments on this point because we have already concluded that he is dangerous on other grounds.

¶33 In all, we affirm the involuntary commitment order. Based on the entire record, including the findings of fact and credibility assessments of the circuit court, the County met its burden of establishing that Daniel was mentally ill, a proper subject for treatment, and dangerous. Additionally, Daniel's challenge to his involuntary medication and treatment order is moot.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.